**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA

v.                                                        CASE NO.  8:15-cr-443-T-26TBM

LAJOYCE CALDWELL HOUSTON and
ERIC DELL HOUSTON

_____/

**O R D E R**

Before the Court is Defendants' Joint Motion to Suppress Evidence and For Return of

Seized Property, and Demand for a Hearing Pursuant to Franks v. Delaware (Dkt. 61), Defendant

Eric Houston's Motion to Suppress Evidence and For Return of Seized Property, and Demand for

Hearing Pursuant to Franks v. Delaware (Dkt. 62), and the Government's Consolidated Response

in Opposition (Dkt. 70).  After careful review of the search warrant affidavits, the submissions of

the parties, and the applicable law, the Court concludes that the motions are due to be denied.

**FACTS**

On May 7, 2014, United States Magistrate Judge Thomas McCoun issued a warrant for

the search and seizure of a sealed envelope addressed to Rita Girven based on the sworn

application of Detective Sharla Canfield (letter affidavit).  Ms. Girven's name was followed by a

prisoner number, and the address shown was the Falkenburg Road jail.  The envelope was found

on April 25, 2014, in a police vehicle assigned to Defendant Eric Houston, a homicide detective

with the Tampa Police Department (TPD).  Eric Houston had been terminated the day before,

April 24, 2014, pursuant to the federal investigation of this case.  The envelope was placed and

locked in Detective Sharla Canfield's office at TPD until the search warrant was obtained.

Detective Canfield was not only a detective with TPD but also a special task force officer with

IRS Criminal Investigations.  She applied for the warrant to open the letter in search of evidence

and instrumentalities of conspiracy, identity theft, access device fraud, and wire fraud in violation

of 18 U.S.C. §§ 371, 1028A, 1029, and 1343, respectively.  The envelope contained a

handwritten note to Eric Houston from Rita Girven.

On May 8, 2014, Judge McCoun issued a warrant for the search of the residence of

LaJoyce and Eric Houston located at 11349 Andy Drive, Riverview, Florida, based on the sworn

application of Detective Canfield (residence affidavit).  LaJoyce Houston, a former sergeant with

TPD, was married to Eric Houston.[1]  The Houstons' residence was searched on May 16, 2014,

for evidence, instrumentalities, and proceeds of conspiracy, identity theft, access device fraud,

and wire fraud pursuant to 18 U.S.C. §§ 371, 1028A, 1029, and 1343, respectively.  The warrant

described various items such as computer and tablet devices, cell phones, account records, EBT

cards, credit and debit cards, and keys.

As set forth in the affidavits as detailed below, the Government's case alleges a fraud

scheme that involved four individuals– the Houstons, Rita Girven and Tonia Bright.  Rita Girven

had been charged along with LaJoyce Houston with welfare fraud in October 2013.[2]  In early

2012, Ms. Girven had been arrested on state charges of identity theft involving opening a prepaid

---

[1]  According to the residence affidavit, LaJoyce Houston was charged with welfare fraud in October 2103 and was fired at that time from TPD.  See docket 61-1, para. 33, and docket 62-1, para. 33.

[2]  See docket 61-1, para. 33, and docket 62-1, para. 33.

debit card in someone else's name.[3]  Since August 2013, Ms. Girven has remained in jail on the

state charge.[4]  Ms. Girven called LaJoyce Houston from jail and discussed how she and others

should use Ms. Girven's EBT card to make purchases in exchange for putting money on her jail

canteen account.[5]  LaJoyce Houston and her brother-in-law, Michael Grill, complied with Ms.

Girven's request and bought food at Walmart.[6]  This conduct led to the welfare fraud charges

against both Ms. Girven and LaJoyce Houston.[7]

        Tonia Bright was a civilian employee with TPD.[8]  Rita Girven and Tonia Bright were

friends, and Ms. Girven would visit her at work frequently.[9]  Ms. Bright used her access to

databases at work to obtain identities, and about 120 individuals who were searched by Ms.

Bright had fraudulent tax returns filed in their names for the tax years 2011 and 2012.[10]  After

---

[3]  See docket 61-1, para. 14, and docket 62-1, para. 14.  Both before and after Ms. Girven's arrest, she worked for a woman (Patricia Shaw) who was convicted in 2011 of filing false claims and fraudulent tax returns.  See docket 61-1, para. 15, and docket 62-1, para. 15.

[4]  See docket 61-1, para. 33, and docket 62-1, para. 33.

[5]  See docket 61-1, para. 33, and docket 62-1, para. 33.

[6]  See docket 61-1, para. 33, and docket 62-1, para. 33.

[7]  See docket 61-1, para. 33, and docket 62-1, para. 33.

[8]  See docket 61-1, para. 37 ("Tonia Bright was a civilian TPD employee working as a community service officer.  As such, her duties included sitting at the front desk of the District Three office and answering the phones.  Bright could originate police reports based upon telephone calls or in-person complaints from citizens.  Bright had access to a computer and to various law enforcement databases as part of her job.  Numerous individuals have reported to your affiant that Rita Girven frequently visited Bright at work and that the two were friends."), and docket 62-1, para. 37 (same).

[9]  See docket 61-1, para. 37, and docket 62-1, para. 37.

[10]  See docket 61-1, para. 38, and docket 62-1, para. 38.

Ms. Girven went to jail, Ms. Girven telephoned Ms. Bright at TPD and asked her to put money on her jail wrist band, which allowed Ms. Girven to make telephone calls from jail.[11]

Both of the Houstons used law enforcement databases to obtain personally identifiable information.[12]  Rita Girven used the information to file fraudulent federal income tax returns in 2011 and 2012.  In doing so, Ms. Girven would open or modify reloadable debit cards on which the fraudulently obtained tax refunds were deposited.  The Houstons purchased goods and services with debit or credit cards funded with the refunds and cash deposits into their joint bank account.  The affidavits described the transactions in great detail.

Defendants take issue with omissions from the substantially similar residence and letter affidavits: (1) that Rita Girven was a confidential informant for TPD; and (2) that Ms. Girven was "part of the Houston family" by virtue of the Houstons having adopted one of Ms. Girven's children.  The omission of a straightforward statement that Ms. Girven was a confidential informant and the omission of a full description of the relationship among Ms. Girven, her biological daughter, and the Houstons, they argue, deceived the magistrate judge and misled him to believe that the interactions among them were "nefarious and indicative of probable cause."[13]  The Houstons challenge paragraphs 33, 35, 37-41, and 43-49 of the residence affidavit, and paragraphs 33, 35, 37-40, 43-44, and 46-47 of the letter affidavit, as paragraphs that could have obtained more information to avoid being misleading.  In addition to omitting vital information from the affidavits, the Defendants also challenge intentional and reckless false statements made

---

[11]   See docket 61-1, para. 40, and docket 62-1, para. 40.

[12]   See docket 61-1, para. 42, and docket 62-1, para. 41.

[13]   See docket 61, p. 7.

in paragraphs 9, 10, 33-35, and 41-43 of the residence affidavit and paragraphs 9, 10, 33-35, and 42 of the letter affidavit. Certain statements, they assert, contain improper and incorrect conclusions or opinions of Detective Canfield.

## DISCUSSION

### Legal Standard

The Fourth Amendment grants the right to be free from unreasonable searches and seizures, which right is protected by the issuance of warrants based on "probable cause, supported by Oath or affirmation . . . " U.S. Const. amend. IV. Although the affidavit supporting the warrant is presumed valid, the truthfulness of the facts in the affidavit may nevertheless be challenged by a defendant. See Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The defendant is entitled to a hearing only if he "makes a 'substantial preliminary showing' that (1) the affiant deliberately or recklessly included false statements, failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (citing Franks, 438 U.S. at 155-56, 98 S.Ct. 2674).

"The substantiality requirement is not lightly met." Arbolaez, 450 F.3d at 1294. A "substantial preliminary showing" requires more than conclusory allegations and must be accompanied by an "offer of proof." Franks, 438 U.S. at 171, 98 S.Ct. 2684. "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." Arbolaez, 450 F.3d at 1294 (quoting Franks, 438 U.S. at 171, 98 S.Ct. 2674). The defendant may submit his own affidavit based on personal knowledge. United States v. Vann, 336 F. App'x 944, 948-49 (11th Cir. 2009) (unpublished opinion) (noting that Vann

could have filed his own affidavit denying that he was the person who sold crack cocaine to the confidential informants and that no one had access to his apartment on the day in question).  A full evidentiary proffer should be attached to the motion for a <u>Franks</u> hearing.  <u>United States v. Ohoro</u>, 724 F.Supp.2d 1191, 1200 (M.D. Ala. 2010).

The defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false" and why it is false.  Not only the inclusion of falsities but also omissions from the warrant affidavit are subject to challenge under <u>Franks</u>.  <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1326-27 (11th Cir. 1997).  More than negligence or mistake must be alleged to justify permitting a hearing.  The statements or omissions must be made intentionally or with a reckless disregard for the truth.  <u>Madiwale</u>, 117 F.3d at 1327.  Potentially relevant omitted information does not amount to an invalid warrant violative of <u>Franks</u>.  <u>United States v. Sims</u>, 845 F.2d 1564, 1571 (11th Cir. 1988); <u>United States v. Aldissi</u>, No. 8:14-cr-217-T-33EAJ, 2015 WL 1268282, at *12 (Fla. M.D. Jan. 23, 2015).  Even after all of these requirements are met, if reading the warrant affidavit without the alleged false or reckless content supports a finding of probable cause, a hearing will not be granted.   Reckless or intentional omissions will invalidate a warrant only if inclusion would have prevented a finding of probable cause.  <u>United States v. Jenkins</u>, 901 F.2d 1075, 1080 (11th Cir.), <u>cert. denied</u>, 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990).  A "reckless disregard for the truth" includes situations where the affiant "should have recognized the error, or at least harbored serious doubts" about his representations.  <u>United States v. Aisenberg</u>, 247 F.Supp.2d 1272, 1328 (M.D. Fla. 2003) (quoting from <u>United States v. Kirk</u>, 781 F.2d 1498, 1502-03 (11th Cir. 1986)), <u>aff'd in part and rev'd in part on other grounds</u>, 358 F.3d 1327 (11th Cir. 2004).

To be entitled to an evidentiary hearing, the Houstons must prove 1) that the detective either intentionally or recklessly left out facts material to the status of Rita Girven as a confidential informant and to the relationship between Rita Girven and the Houstons, 2) that the detective either intentionally or recklessly made false statements, and 3) that inclusion of the omitted facts and redaction of the false statements in the affidavit would have prevented a finding of probable cause.  The Court finds for the following reasons that the Houstons failed to make a substantial preliminary showing of a <u>Franks</u> violation and are therefore not entitled to a <u>Franks</u> hearing.

### Omission of Material Information that Rita Girven was a Confidential Informant

The Houstons assert that Rita Girven had been a confidential informant for TPD since 2004; yet, the affidavits make no mention of this fact.  Had this been revealed, the defense argues, the communications between Ms. Girven and Eric Houston[14] would have made sense– that she was doing her job of providing information to police.  It would explain why she was asking Eric Houston to get an earlier court date for her and why he might owe her favors.  By urging this inclusion, however, the defense raises more questions than answers about her alleged status as a confidential informant.

The Government proffers the TPD policy that prohibits officers from meeting in person with their confidential informants and from socializing and fraternizing with them.  The policy also forbids payments for assistance absent documentation of those payments.  Detective Canfield did include, however, specific instances of Ms. Girven's attempts to provide TPD with

---

[14]   The defense does not question that Ms. Girven never acted as a confidential informant for LaJoyce Houston.

information regarding crimes.  That Ms. Girven acted as a confidential informant for Eric Houston is untruthful, based on the lack of proffers from the defense and the proffers from the Government regarding the TPD policy, unless there was some agreement between the two violative of that policy.

In addition to viewing the omissions as they affect the affidavits as a whole, reading the specific paragraphs separately, with which the defense takes issue, does not establish a substantial preliminary showing of a Franks' violation.  The resident affidavit does not state that CI#2 feared that information given would be leaked *by the Houstons* to Ms. Girven.[15]  CI#2 simply provided information that Ms. Girven was "connected with the Police" and did not identify the connection or leak as either of the Houstons.[16]  The resident affidavit also contains CI#2's statement that one of Ms. Girven's cars was registered to Eric Houston; however, this averment does not imply Eric Houston would leak information to Ms. Girven.[17]  If Ms. Girven was acting as a confidential informant to other police officers and the affidavits had included this information, then more credence would be given to CI#2's concern that information would have been leaked by the police, not Eric Houston, to Ms. Girven.  Thus, more emphasis on Ms. Girven's relationship with the police bolsters CI#2's statements.

---

[15]   The resident affidavit refers to CI#2, who is a confidential informant who had visited Ms. Girven's apartment and seen ledgers and laptop computers often associated with offenses of stolen identity tax refund fraud.  Both affidavits refer to CI#1, who discovered the National Crime Information Center (NCIC) and Driver and Vehicle Information Database (DAVID) searches conducted by LaJoyce and Eric Houston in 2011 and 2012.  See docket 61-1, para. 42, and docket 62-1, para. 41.

[16]   See docket 61-1, para. 41.

[17]   See docket 61-1, para. 41.

As to concerns over statements omitted about Tonia Bright, the affidavits make it clear that Tonia Bright was a civilian employee of TPD and a friend of Ms. Girven.  The affidavits could not realistically be interpreted, as the defense argues, to imply that Ms. Girven was asking LaJoyce Houston to add money to Ms. Girven's canteen account, or to imply that LaJoyce Houston knew that Ms. Girven had provided assistance to Tonia Bright, therefore making LaJoyce Houston "complicit in their [Ms. Girven's and Tonia Bright's] scheme."[18]  Detective Canfield avers that on a recorded jail call on September 12, 2013, Ms. Girven had asked Tonia Bright to place $20 on her jail wrist band.[19]  She further avers that on September 17, 2013, Ms. Girven and LaJoyce Houston had a cellular telephone conversation in which Ms. Girven asked LaJoyce Houston to enlist "other TPD officers to whom she [Rita Girven] had provided assistance" to contribute canteen money in addition to herself.[20]  It is stretching the contents of the affidavits to assume, as the defense urges, that the magistrate judge would have believed that Ms. Girven was referring to Tonia Bright, a civilian, when the affidavits clearly refer to TPD officers.  Thus, the addition of information about Ms. Girven operating as a confidential informant would have made no difference.

Finally, if the affidavits had affirmatively stated that Ms. Girven was never a confidential informant for Eric Houston, yet she referred to him as "daddy," the implications would more

---

[18]   See docket 61, p. 10.

[19]   See docket 61-1, para. 40, and docket 62-1, para. 40.

[20]   See docket 61-1, para. 47 ("With regard to buying food packages for Girven, LaJoyce noted that she could not place an online order from a computer at work, but would have to do so from her computer at home, the Subject Premises.  Girven asked her for food and asked that she request that other TPD officers to whom she had provided assistance give LaJoyce Houston money to buy her canteen items."), and docket 62-1, para. 43 (same).

strongly suggest that their relationship was not a legitimate one between an officer and a confidential informant under the TPD policy.  Moreover, if Eric Houston was attempting to conceal his identity by 1) sending a letter to a confidential informant with a false return address 2) signing the note inside "Crazy Horse Driver," and 3) receiving a note addressed to "Mr. Mad," then he did so outside the boundaries of any legitimate, sanctioned policy.  The omission of identifying Ms. Girven as a confidential informant is inconsequential to the finding of probable cause.

### Omission of Material Information that Rita Girven was Like Extended Family

The Houstons contend that the detective fatally failed to mention that LaJoyce Houston had known Rita Girven for 15 years and Eric Houston had know her for 20 years.  According to the motion, Eric Houston met Ms. Girven in 1994 through a law enforcement community program that encouraged positive relationships between children living in high crime areas, like Ms. Girven, and law enforcement.  They lost touch but reconnected in 2004 when she assisted law enforcement on a case of a missing 8-year old girl.  At that time, Ms. Girven was pregnant and both Eric and LaJoyce Houston knew that her living situation was not conducive to raising children.  Knowing that they could not have children, the Houstons took the baby girl into their home and legally adopted her in 2009 with Ms. Girven's blessing.  Had the extent and depth of the relationship been made clear in the affidavits, the Houstons argue, all of the very frequent communications would have been fully explained and would not have painted a picture of a criminal conspiracy.

A review of the affidavits reveals that Detective Canfield did in fact disclose that the Houstons were the adoptive parents of Ms. Girven's daughter.[21]  As noted by the Government, detectives may aver only what exists by virtue of their own personal knowledge, not what others think or experience.  Detective Canfield swore to the facts she knew, including that the relationship between the adoptive parents and the biological mother included frequent interactions on very amicable terms.  There is no proffer of affidavits of the Houstons or anyone else to substantiate the totally innocuous relationship promoted by the defense or to deny any wrongdoing on their part.  Depicting the complexity of the relationship may be realized at trial.  See United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009) (denying Franks hearing because alleged omissions were merely "selective characterizations and exaggerations of what [the victim] said that did nothing to strike at the core of the probable cause finding.").  Had more details of the relationship between a convicted felon and police officers been included in the affidavits, a probable cause determination may have been even more imminent.

Adding information about the relationship to the affidavits would not explain how Ms. Girvin, who had no income and received food stamp benefits, was able to assist the Houstons in paying off their debts, much less why the Houstons as police officers would accept payments.  Apart from Detective Canfield's personal observations, the affidavits include statements made by other witnesses to law enforcement agents about their knowledge of the Houstons and Ms.

---

[21]  See docket 61-1, para.47, p. 27 ("Among other things, Girven and Houston discussed the Houstons' adopted daughter, who is Girven's biological child.") and docket 62-1, para. 43, p. 21 (same).

Girven.[22]  The affidavits also include numerous detailed communications between the Houstons and Ms. Girven.[23]  The Court does not see how adding the omissions regarding the relationship would change the finding of probable cause.  More facts regarding the very unusual relationship may even bolster a finding of probable cause.

### Material False Statements Establishing Financial Transactions

*Green Dot Debit Card*

The Government admits Detective Canfield makes an unintentional reference to three rather than four victims of tax fraud in connection with a specific Green Dot debit card.  Additionally, while only one refund was actually "loaded" on the card , three more tax refunds

---

[22]  See docket 61-1, para. 35 (CI#1 told Officer Ryan O'Neal that Ms. Girven and Ms. Bright were involved in a scheme to obtain personal information from license tag numbers on cars driven by older people), docket 61-1, para. 41 (CI#2 told TPD detectives that on a visit to Ms. Girven's apartment in 2012, ledgers associated with stolen identity refund fraud were observed, that Ms. Girven was "connected with the Police" and this information ran the risk of being leaked to Ms. Girven, that Ms. Girven bought cars with tax refund cards, and that one of her cars was registered to Eric Houston).  The Houstons' insistence that the registration of Ms. Girven's car in Eric Houston's name was added to look patently "criminal" without a more thorough explanation of the relationship, is simply not persuasive.  In any event, Detective Canfield avers that the car was registered to Ms. Girven, not Eric Houston, thus dispelling any "criminal" effect.  Again, the defense has provided no proffer that the car was or was not registered in Eric Houston's name.

[23]  See docket 61-1, para. 33 (several telephone calls between Ms. Girven and LaJoyce Houston about using Ms. Girven's EBT card in exchange for putting money on the jail canteen account, and LaJoyce Houston and her brother-in-law both used Ms. Girven's EBT card), docket 61-1, para. 43 (19 calls between LaJoyce Houston and Ms. Girven, in jail in 2013, and between Eric Houston and Ms. Girven in which she spoke about her pending criminal charges, and LaJoyce Houston accessed Ms. Girven's EBT card and gave the card to LaJoyce's sister to use), docket 61-1, para. 46 (calls and texts between Ms. Girven and Eric Houston while Ms. Girven was in jail about her going to court and wanting to share information about "a shooting at Fatso's"), docket 61-1, para. 47 (34 calls between Ms. Girven and the Houstons at their home and at least one to Eric Houston at work about getting her an earlier court date, sending her an iCare package, talking to the judge for her, and putting money on the jail account in exchange for LaJoyce Houston using her EBT card).

were loaded but rejected by Green Dot.  The nuance of whether the card was loaded or loaded but rejected, however, does not "strike at the core" of the magistrate judge's finding of probable cause.  Neither does the number of victims.

Although Detective Canfield avers that the Green Dot card had been "frozen," resulting in four declined transactions in September 2011, the defense challenges this statement as false. Documents provided in discovery reveal that the card was not technically "frozen" but was used 14 times over two days in September 2011 for a total of $2,000 purchases.  The Court finds that whether the card was "frozen" is irrelevant to a determination of probable cause because the statements show that the card held income tax refunds that were obtained through fraud. Whether the cardholders were successful in their attempts to use the card is not important to the finding of probable cause.

*Use of Ms. Girven's EBT card in exchange for placing money in jail account*

The Houstons proffer pleadings from the state court criminal case against Ms. Girven as evidence that statements in the affidavits are false.  Detective Canfield conveys in the affidavits the substance of conversations between Ms. Girven and LaJoyce Houston, which were recorded at the jail, concerning the use of the EBT card in exchange for placing money on Ms. Girven's jail canteen account.  The defense agrees that Ms. Girven told LaJoyce Houston that she had told Michael Grill, LaJoyce Houston's brother-in-law, to reimburse her by fifty cents on the dollar when he used the EBT card.  The pleadings from the state criminal case, however, contain a sworn statement from Mr. Grill that Ms. Girven never told him that he had to reimburse her.  The pleadings were drafted and signed in November 2014, and the conversations in jail occurred in 2012 and were placed in the affidavits in April and May 2014.  The order of November 2014 in

-13-

the state case does not embody what was known by Detective Canfield at the time she submitted the affidavits and does not affect the probable cause determination.

*Statements regarding CI#1*

Detective Canfield avers in the affidavits as to what CI#1 told agents.  The detective never states that CI#1 failed to identify Tonia Bright as the friend who assisted Ms. Girven with obtaining personal identity information on older drivers from their license tags.  CI#1 had told agents that Ms. Girven bought a Louis Vitton handbag for Tonia Bright at the University Square Mall Macy's.  Although the defense claims that Macy's informed them that they never sold Louis Vitton handbags, Detective Canfield merely places information on file in the affidavits and does not swear that everything CI#1 said was the truth.  Finally, with respect to discovery materials showing that CI#1 stated the Houstons had a $10,000 bill on their Home Depot account, the detective never makes this statement in the affidavits.  Instead she states that she had not yet received the Houston's account records to corroborate CI#1's statements.[24]

*Registration of Car in Eric Houston's Name*

The Houstons argue that Detective Canfield intentionally lied about the silver Infiniti belonging to Ms. Girven but being registered to Eric Houston.  It is true, however, that CI#2 told agents that the silver Infiniti was bought by Ms. Girven with funds from an H&R Block card and later registered in the name of Eric Houston.  When Detective Canfield attempted to corroborate

---

[24]  See docket 61-1, para. 35 ("The CI also advised that he/she believed there was an account at home improvement store, perhaps Home Depot, that Girven paid off for the Houstons with funds obtained from tax fraud.  Your affiant is awaiting additional documentation, but did receive correspondence from CitiBank that Eric Houston and LaJoyce M. Caldwell had a joint Home Depot credit card (issued by CitiBank) with an account ending in -6609 listing the account holders' address as the Subject Premises.").

the information, she learned that the car was registered to Ms. Girven in May 2014 and put this information in the affidavits. [25]

The Court finds that the Houstons failed to show by a preponderance of evidence that Detective Canfield intentionally or recklessly omitted material facts or included false statements such that she should have recognized error.  There was no proffer regarding the omissions– no affidavits of the Houstons, Rita Girven, Tonia Bright, or anyone else; only the *unsupported self-serving representations* of defense counsel which the Court cannot consider.  Cf. United States v. Portes-Ramirez, 260 F.3d 1310, 1314 (11th Cir. 2001) (holding that government did not meet its burden of demonstrating property had been destroyed by simply making that allegation in an unverified pleading with no supporting affidavit).  Furthermore, the unsupported proffers regarding the false statements were satisfactorily negated or explained by the Government.  Finally, even if a preliminary showing of deliberate untruthfulness or reckless disregard for the truth had been made, the alleged false statements and omissions were not necessary to the finding of probable cause.

It is therefore **ORDERED AND ADJUDGED** as follows:

1) Defendants' Joint Motion to Suppress Evidence and For Return of Seized Property, and Demand for a Hearing Pursuant to Franks v. Delaware (Dkt. 61) is **denied**.

---

[25]   See docket 61-1, para. 41 ("CI#2 advised that Rita Girven purchased a silver Infiniti car in 2013, with funds from an H & R Block Card, at a Jamaican car lot located at N. 40th St. and E. Hillsborough Ave which was subsequently registered to Eric Houston.  Your affiant looked in DAVID and determined that a silver Infiniti is currently registered to Rita Girven.")

2)      Defendant Eric Houston's Motion to Suppress Evidence and For Return of Seized

Property, and Demand for  Hearing Pursuant to <u>Franks v. Delaware</u> (Dkt. 62) is

**denied.**

**DONE AND ORDERED** at Tampa, Florida, on January 4, 2017.


____s/*Richard A. Lazzara*_____
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record